Filed 7/24/13  P. v. Souza CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANDREA KELLY SOUZA,<br><br>        Defendant and Appellant. | A134270<br><br>(San Mateo County<br>Super. Ct. No. SC-068770) |

Defendant Andrea Kelly Souza appeals from her conviction of grand theft by embezzlement.  She contends her Sixth Amendment right to confront witnesses against her was violated by the admission of hearsay statements made by her codefendant, who is also her former husband.  We find no error and affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.  Pretrial Proceedings

On June 7, 2010, an amended information was filed against defendant charging her with one count of felony grand theft by embezzlement.  (Pen. Code, §§ 487, subd. (a) & 508), with a special allegation that the value of the embezzled property exceeded $65,000.  (Pen. Code, § 12022.6, subd. (a)(1).)  She was charged jointly with her now former husband, Michael Souza (Souza).

### A.  Motion in Limine

Also on June 7, 2010, defendant filed a motion in limine to prevent the introduction of statements Souza made to a police officer who was conducting a

residential search. Defendant argued, in part, that absent the ability to cross-examine Souza, the admission of statements made by him during a police interview would contravene her Sixth Amendment right of confrontation under *Crawford v. Washington* (2004) 541 U.S. 36, 52 (*Crawford*).

At the hearing on this motion, officer Rio DelMoral testified that he interviewed Souza at his house in Modesto on May 3, 2007. DelMoral had gone to the residence with other officers to execute a search warrant. The officers initially placed Souza in handcuffs and conducted a protective sweep of the house. When they searched the home, they found over 930 lithographs. After the handcuffs were removed, DelMoral told Souza that lithographs had been found in the back bedroom of the residence. When asked how he came into possession of the items, Souza stated that he had obtained the alarm security codes for a business called Prints Old and Rare. He had taken these codes from his wife, without her knowledge, and had entered the warehouse in the early morning hours to steal the items. He said he had done this on three different occasions. He did not specify the dates on which he entered the warehouse. He admitted to selling the stolen lithographs on the Internet using the eBay identity "Souzastuff." He said he and defendant were separated and that she was not involved in the crime.

DelMoral subsequently contacted defendant. She came to the police station for an interview and denied having played any role in the theft. She said her boss at Prints Old and Rare had given her some lithographs to take home to photograph and upload to the computer. She denied stealing any of the items that were seized from the Modesto residence. She said she had not been living in the Modesto house for several weeks or months. Defendant's motion in limine was denied.

## B. Evidence Code Section 402 Hearing

On June 8, 2010, Souza pled no contest to the charges against him. During a hearing on an Evidence Code section 402 motion, Souza asserted his privilege against self-incrimination. The prosecution declined to grant him immunity. The trial court found that he had a valid Fifth Amendment claim because he had entered a conditional plea and was still potentially liable to the prosecution.

2

The prosecutor then requested authorization under Evidence Code section 1230 (section 1230)[1] to introduce hearsay evidence of the statements Souza made to DelMoral. In response, defense counsel argued that these statements were barred under *Crawford.* He further argued that because Souza had entered a plea of no contest, any declarations made against his own penal interests were no longer relevant. Their only relevance at trial would be to implicate defendant. Alternatively, counsel noted that if the matter were continued until after his sentencing, Souza would no longer be able to assert the privilege against self-incrimination and could be cross-examined at trial.[2] Counsel also noted that had Souza remained in the case, the admission of his statements would have raised issues under *Aranda/Bruton* (*People v. Aranda* (1965) 63 Cal.2d 518, 530–531 [when the prosecution intends to offer the extrajudicial statement of one defendant which incriminates a codefendant, the trial court must either grant separate trials, exclude the statement, or excise all references to the nondeclarant defendant]; *Bruton v. United States* (1968) 391 U.S. 123, 127–128.)

The prosecutor asserted that if Souza's statements satisfied section 1230 as having been made against his penal interests, then *Crawford* would not be implicated. Defense counsel countered that *Crawford* grants the right to confront hearsay statements made in a testimonial setting. Ultimately, the trial court disagreed with defense counsel's assertion that section 1230 is trumped by *Crawford.* Yet the court noted the last part of this statue provides that the statement must be such that a reasonable person would not have made it unless he or she believed it to be true. Here, it appeared the prosecutor wanted to impeach some of Souza's statements, suggesting she believed them to be unreliable rather than truthful. The prosecutor then clarified that she would only

---

[1] Section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

[2] The court noted Souza could be unavailable for a long time because restitution was unlikely to be decided until after trial. It declined to continue the matter.

introduce the statements that she believed to be true, namely, his admission that he had sold stolen lithographs on the Internet. The court sided with the prosecution, concluding: "I think [section] 1230 anticipates evidence being used against the declarant and also anticipates evidence being used against somebody else."

In further argument the following day, the prosecutor said she did not believe Souza's statement that he entered the warehouse in the early morning hours to steal the lithographs. She conceded that portion of his statement "would not fit under [section] 1230." She also stated "under [section] 1230 the parts that are reliable because it's a declaration against penal interest should be admitted, which again is the portion that I'm seeking to admit." The trial court allowed that defendant would have the right to challenge the reliability of the entire statement: "If [defense counsel] wants to, for instance, bring in the rest [of the statement] to show that the whole thing is unreliable I think that's his choice."

## II. Trial

### A. Opening Statements

The defense theory, introduced in defendant's counsel's opening statement, was that Souza committed the crime without her knowledge or complicity: "[Defendant] is going to tell you she took things home just as she told the police when they questioned her about this. Said yes, I took items home with me. I had items I kept there that I worked on, photographed, cataloged. These items were then available to [Souza] to pilfer, to steal, to take from at his leisure when [defendant] was not there." Defense counsel also revealed to the jury that Souza had pleaded no contest to a charge of possession of stolen property, and "he has admitted to the police that he stole the lithographs that he was selling and that [defendant] didn't have anything to do with it."

### B. The Prosecution's Case

### 1. Kathleen Manning

Kathleen Manning owns the business Old Prints and Rare along with William Hall. They sell old maps, prints, and books to libraries, universities, art galleries, and collectors. The business occupies two warehouses that are located next to each other in a

business park in Pacifica.  The business has a very large inventory.[3]  Manning testified that she is not aware of any businesses in the United States that are comparable to hers, in terms of the size of its inventory and its reputation for being able to fulfill customer requests.  On an average day, four to six employees are present at Prints Old and Rare. The prints are kept on open shelves.  They are not secured because customers do not come in very often as it is not a retail business.

Manning hired defendant in 1997.  Defendant eventually became the company's office manager.  She is very good with computers.  After she was hired, she completed the creation of the company's website.  Over the years defendant worked for Manning, they built a relationship of trust.  Manning and Hall knew her family and were happy to loan her money when needed.  During that time, defendant never said she had an Internet business that sold lithographs and maps, however Manning did know that Souza sold handicapped accessories online.

Defendant had access to the company's PayPal account, including access to its password.  The account was set up to receive payments from customers, and to transmit payments when the company made online purchases.  The PayPal account was funded through Manning's American Express card and a Wells Fargo checking account. Defendant had exclusive control over the PayPal account.  Manning herself did not know the password to the account.  She never made any direct payments from the PayPal account into defendant's PayPal account, and never authorized any such payments.

Souza never officially worked for Prints Old and Rare, but the owners would give him part-time work to help him make a little money from home.  On maybe six occasions, Hall gave defendant atlases to take home for Souza to take apart for the maps. Manning also asked him to look on eBay and pick out items that she might be interested in.  He would e-mail these listings to her, and she would let him know which ones he could bid on for her and how much to bid.  He would place the bids for her under her

---

[3] At the time of trial, over a thousand items were posted on the company website.  Hundreds of thousands of lithographs and maps were stored at the company warehouses.  Manning does not have a central catalog of all those items.

personal eBay name, which is not tied to the company's PayPal account.  He never worked at the business site in Pacifica, nor did he have an opportunity to be alone there.

After defendant's family moved from Pacifica to Modesto, she started working from 5:00 a.m. to 2:00 p.m. in order to avoid rush-hour traffic.  Manning did not arrive at work until around 9:00 a.m., so defendant would be there alone in the early morning hours.  Defendant was allowed to work from home on Mondays, when the business was closed.  Sometimes she would take home a memory card containing photographic images of store merchandise.  She could edit the photographs and upload them to the website from home.  She was not allowed to take actual lithographs, prints, or maps home.  Employees are not allowed to remove such property from the business.

In April 2007, Manning received calls from two people who said they had seen Audubon lithographs being sold on eBay that probably belonged to Manning's business.  In the 1840's, John James Audubon created lithographs of birds that are very well-known and very valuable.  Some of his prints were bound in books and each book contains a set of images of 550 American birds.  Between 1,000 to 1,200 such sets were made of the first edition.  Manning estimated she had purchased about 800 Audubon images for her business over the years.  When she went onto the eBay site, she saw several Audubon birds were being sold by a vendor in Pacifica identified as "Souzastuff."  This was upsetting because "Souza" is also defendant's last name.  Subsequently, Manning became aware of a vendor called "Eprintseller."  Manning never authorized any purchases from that vendor.

Manning went to the police station to look at the prints that were recovered from the Modesto house.  Most of the prints were in plastic sleeves with a backing.  Manning and Hall had put price stickers on the upper right hand corner of the sleeves.  The total value of what was recovered from the home was estimated at $95,990.50.  Over time, Manning had noticed that some items appeared to be missing from the warehouses.  About 25 percent of the items recovered by the police were items that she had previously wondered about.  In reviewing the eBay sales records for Eprintseller, Manning saw

6

descriptions of several items that would have been sold by her business. The seller log for Souzastuff also described items that she would sell, including Audubon lithographs.

Prints Old and Rare is equipped with an alarm system. Employees are given individual pass codes, and the alarm company keeps records that show whose pass code was used to enter the building at a given time. If there had been a break-in during the middle of the night, the alarm company would have contacted Manning. The alarm company's records covering the time period relevant to this matter do not show any unusual activities. Souza was never given an alarm pass code. Defendant did have such a code. She would deactivate the alarm when she arrived for work early in the morning. The alarm records would have shown whether defendant had disarmed the alarm, and the time she arrived.

After the search warrant was executed, defendant came to Manning's house. They were both very upset. Defendant said that it wasn't her fault. Manning knew defendant and Souza had been having marital problems and that defendant had moved out of the house in Modesto. Defendant had asked her for a loan so that she could move, and Manning had loaned her $3,000.

## 2. *Melinda Lindner*

Melinda Lindner works at Prints Old and Rare. She has worked there since May 2000, and was the office and sales manager at the time of trial. One of her ongoing job duties is to keep track of purchases that are shipped to the business. Between 2000 to 2007, she never saw a record of, or received a package from, an eBay seller called Eprintseller. She affirmed that employees are not allowed to take lithographs or prints from the office.

## 3. *Julie Jones*

Julie Jones worked for Prints Old and Rare as a writer and photographer about five years prior to trial. Her employment lasted about seven months. During that time, defendant mentioned that she had an eBay business with her husband selling prints and other items that they found at estate sales. She said the business was profitable. Jones left the company after she was fired by defendant.

7

### 4. Officer Rio DelMoral

After the crime was reported by Manning, DelMoral set up a sting purchase on eBay. He used his personal eBay account screen name to bid on a printed image of a fish offered by Souzastuff. Subsequently, DelMoral asked if he could pay by cashier's check, and he was directed to send the payment to Souza's house in Modesto. Officers had the house under surveillance when Souza took delivery of the package containing the check from a FedEx driver. The fish print was sent to an address in Petaluma.

DelMoral went to the home in Modesto on May 3, 2007, to serve a search warrant. Souza was in the house when he arrived, along with his two daughters. During the search, the officers found approximately 934 lithographs and photos. The items were unsecured, and were found in an attached garage as well as in a back bedroom. They also found packing materials used to mail out lithographs to customers.

Souza admitted he used Souzastuff as his seller name when selling lithographs on eBay. He acknowledged the items in his home were stolen. He said he had taken them from Prints Old and Rare in Pacifica. He said defendant did not have anything to do with the theft. He also stated that he had set up an e-mail account in the name of Bertina Souza, which he used to set up the Souzastuff account.

Manning had also told DelMoral that she was concerned because she was not receiving any packages from Eprintseller, though purchases were made using her PayPal account. DelMoral learned that Eprintseller was an eBay account registered to defendant. Two credit cards linked to the account are in defendant's name. Fifty-one total payments were made from Manning's business accounts to Eprintseller between 2000 and 2007 The total dollar amount for the transactions was $8,950.59.

On redirect, the prosecutor asked DelMoral if Souza had told him how he managed to steal the items from Prints Old and Rare. Defense counsel objected and the objection was overruled. DelMoral testified that Souza told him he had stolen the pass codes to the alarm system for Prints Old and Rare from defendant. He also said he took the keys from her without her knowledge, entered the building, and removed various lithographs. He went there between 3:00 a.m. and 5:00 a.m. DelMoral reviewed the

8

alarm records for the six month period of November 2006 to May 2007. There was no record of someone using a pass code to enter the building during those hours. Based on the alarm company's records, DelMoral came to the conclusion that Souza had not been telling the truth when he said he entered the building.

## 5. *William Hall*

William Hall owns Prints Old and Rare with Manning. He does almost all the pricing of items for the business. Starting around 2006, Hall would give defendant atlases to take home for Souza so that he could earn some money while he stayed home with the couple's children. Souza would break down the atlases into individual pages of maps. Hall would give defendant one atlas at a time to take home. He did not give her lithographs and prints, only atlases. Hall also testified that many of the items that had been listed for sale by Souza were priced much lower than what they were worth.

## C. *The Defendant's Case*

Defendant testified that she was responsible for taking photographs and listing the items for sale on the Prints Old and Rare website. She learned how to value these items over time with experience, and also by researching the items with Manning's help. She lived in Pacifica until 2004, when she and Souza moved to Modesto. She testified she was unaware of Souzastuff or Eprintseller until after charges had been filed in this case.

Defendant's job duties were to maintain the website, process customer orders, and help Manning with various projects. In 2007, she earned $25 per hour and worked between 32 and 40 hours per week. Sometimes she worked at home. She testified that Manning and Hall allowed her to take prints home to work on, and that she did so regularly. An employee named David Alonzo would help her load prints into her car.

At home, she would write descriptions of the items and upload them to the website. She would print the descriptions and put one description on the back of each print and bring them back to the workplace when she was done. She could not explain why the owners testified that no one was allowed to take prints home. When defendant separated from her husband, she left packages of prints at the Modesto house that she had

9

been planning to work on. She was distracted, and thought the prints would be safe and that she could retrieve them at some point in the future.

Defendant testified that she never had her own PayPal account, though Souza sold items on the Internet through eBay. If she wanted to buy anything online, she would ask him make the purchase using his PayPal account. She did not know his password. She did know all the passwords for Manning's accounts. Manning set up the accounts and chose the passwords. Defendant would handle payments for Manning for items bought on eBay. She never made payments for things that were not authorized by Manning or Hall. She did not recall ever making a payment to Eprintseller.

After the search warrant was executed in Modesto, Souza called her and said he had done "something really bad." When Souza told her that the police had been to the house she contacted Hall and told him what had happened. Hall told her she would not be able to continue working for the company. She denied having been aware that Souza was selling items belonging to Prints Old and Rare.

On cross-examination, defendant was questioned about a purchase of pink Capri pants made on eBay in October 2003 using the Eprintseller account. The shipment was made to the Modesto house under her name. The purchase was accompanied by a message to the seller, stating: "I know that you work and all, but any chance you can ship before Saturday maybe today or tomorrow? I wanted to wear them for my birthday. I love pink. My birthday is Sunday. Thanks." Despite the personalized message, defendant testified that she never had used that PayPal account. On redirect, she said that Souza had given her the pink Capri pants.

On rebuttal, David Alonzo testified for the prosecution that he never helped defendant load lithographs or prints into her car.

### D. Objection to DelMoral's Testimony

Outside the presence of the jury, defendant objected to the prosecutor's redirect examination regarding the statements Souza made to DelMoral. Her counsel stated that on cross, he had questioned the officer as to the statements made against Souza's penal interests only, namely, that he stole the lithographs and that defendant was not involved.

10

Her counsel did not ask about how the lithographs were stolen because he did not believe that part of Souza's statement was credible in light of the evidence. He complained that the prosecutor, on redirect, had questioned the officer as to the method by which Souza claimed he stole the lithographs. He contended this was improper impeachment because "by allowing that to come in . . . it was essentially cross-examining the [section] 1230 hearsay statement and I don't believe that that was proper. I objected under grounds of *Crawford* and my [client's] Sixth Amendment right to confrontation."

The prosecutor responded that defense counsel had conceded Souza's statement on this point was unreliable, adding, "I just cannot see how the law would be where we know there is something untruthful in front of the jury and the People's hands are tied and we can't show that and the jury cannot assess for themselves as fact finders in a trial what statement is true or not true." Defense counsel replied, "that the prosecutor should not have been allowed to cross-examine, essentially create a cross-examination of a hearsay declarant by a statement that was factually untrue." The court reiterated its earlier ruling, noting that the prosecutor had restricted her initial presentation to the portion of Souza's statement that she believed to be accurate, that is, that he admitted to selling stolen lithographs. Defense counsel had introduced the idea that Souza had stolen the items and that defendant had nothing to do with the crime. By moving from the act of selling to the act of stealing, this allowed the prosecutor to challenge the unreliable portion of the statement on redirect: "So at that point I think the alleged false comments by [Souza] became relevant. So that's why I let them in."

## E. Closing Arguments

During closing argument, the prosecutor told the jury that there was nothing to support Souza's statement that he stole the prints by going to Prints Old and Rare between 3:00 a.m. and 5:00 a.m. and deactivating the alarm system. She also pointed out that there was no reason for him to have done so, since defendant herself admitted she frequently took prints home.

11

*F.  The Verdict*

On June 11, 2010, the jury found defendant guilty of embezzlement and found the special allegation to be true.

*III.  Posttrial Proceedings*

On January 5, 2012, the trial court placed defendant on probation, and ordered her to serve six months in county jail and to pay $300,000 in victim restitution.  This appeal followed.

**DISCUSSION**

*I.  Contentions and Standard of Review*

Under *Crawford,* out-of-court statements made by a witness that are testimonial in nature are barred by the Sixth Amendment's confrontation clause unless the witness is unavailable at trial and the defendant had a prior opportunity to cross-examine him or her, regardless of whether the statements might otherwise be deemed reliable. (*Crawford, supra,* 541 U.S. 36, 68.)  Defendant contends her right of confrontation was violated by admission of the statement made by Souza, who did not testify, that he personally stole the lithographs from the Prints Old and Rare warehouse.  We independently review whether evidence was admitted in violation of the confrontation clause.  (*Lilly v. Virginia* (1999) 527 U.S. 116, 137.)

*II.  The Contested Statement Was Not Hearsay As It Was Not Offered for the Truth*

It is undisputed that Souza's statement regarding how he entered the victim's business by disabling the alarm system is false.  Therefore, the statement is not hearsay, as it was not offered by the prosecution to prove the truth of the matter stated.  (See Evid. Code, § 1200 [hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"].)[4]  " ' "If a fact in controversy is whether certain words were spoken or written

---

[4] For purposes of the hearsay rule, a "[s]tatement" is defined as an "oral or written verbal expression" or "nonverbal conduct of a person intended . . . as a substitute for oral or written verbal expression."  (Evid. Code, § 225; see *People v. Lewis* (2008) 43 Cal.4th 415, 497–498. Hearsay is not admissible unless it qualifies under an exception to the hearsay rule.  (Evid. Code, § 1200, subd. (b).)

12

and not whether the words were true, evidence that these words were spoken or written is admissible as nonhearsay evidence." ' [Citations.]" (*People v. Smith* (2009) 179 Cal.App.4th 986, 1003.)

Because the statement was manifestly untruthful, its admission does not implicate *Crawford.* The United States Supreme Court in *Crawford* observed that the Confrontation Clause "does not bar the use of testimonial statements for purposes *other than establishing the truth* of the matter asserted." (*Crawford, supra,* 541 U.S. 36, 59, fn. 9, citing to *Tennessee v. Street* (1985) 471 U.S. 409, 414 (italics added).) Instead, the focus of that case was on statements deemed facially reliable: "Admitting statements *deemed reliable by a judge* is fundamentally at odds with the right of confrontation." (*Crawford, supra,* at p. 61.)

The California Supreme Court has held that nonhearsay evidence does not implicate the concerns addressed in *Crawford.* In *People v. Thomas* (2012) 53 Cal.4th 771, 803 (*Thomas*), the defendant contended that the trial court erred in admitting drawings of a crime scene, which were used to illustrate the testimony of three eyewitnesses. The defendant argued that "because the drawings demonstrated the artist's interpretation of what the scene looked like, they constituted hearsay that was inadmissible under state law." (*Ibid*.) He also claimed the admission violated the confrontation clause under *Crawford.* (*Thomas, supra,* at p. 803.) Our Supreme Court stated: "To the contrary, because the drawings were admitted solely to illustrate the witnesses' testimony, and not for the truth of the matters portrayed, they did not constitute inadmissible hearsay. [Citation.] Furthermore, the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citations.]" (*Ibid*.)

Parenthetically, the court in *Thomas* also noted the following cases: "*People v. McKinnon* (2011) 52 Cal.4th 610, 656 & fn. 28 . . . [no confrontation clause violation where gang expert's testimony regarding rumors that a member of defendant's gang had been killed by a member of a rival gang was admitted for the nonhearsay purpose of explaining defendant's motive]; *People v. Mendoza* (2007) 42 Cal.4th 686, 698–699 . . .

13

[no confrontation clause violation where murder victim's statements accusing defendant of molestation were admitted for the nonhearsay purpose of explaining defendant's state of mind]; *People v. Ledesma* (2006) 39 Cal.4th 641, 706, fn. 17 . . . [no confrontation clause violation where identification of defendant in a photo lineup by a witness to a robbery was admitted for the nonhearsay purpose of establishing defendant's motive for killing the witness]." (*Thomas, supra,* 53 Cal.4th 771, 803–804.)

While the trial court here focused on whether section 1230 is rendered moot by *Crawford,* that Evidence Code section is not intended to apply to statements that are unreliable or untrustworthy: " 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of [section 1230], and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the *possible motivation* of the declarant, and the *declarant's relationship to the defendant*.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584, italics added.)

Here, defendant concedes that Souza's statements regarding how he acquired the lithographs are untruthful. Thus, section 1230 does not apply. The statement that he stole the alarm codes from defendant and used them to enter the victim's building is not hearsay at all, and was admissible for the nonhearsay purpose of allowing the jury to infer that Souza was trying to protect defendant by claiming he had stolen the lithographs himself, without her knowledge.[5]

As to the reliable aspects of Souza's statement, namely, the admission that he sold stolen lithographs on eBay, defendant did not object to the introduction of that portion of the statement. Indeed, her principle defense was that Souza had committed the crime without her knowledge or participation. In sum, we find no *Crawford* violation.

---

[5] We also note defendant does not assert in her appeal that the evidence lacked relevance.

### III. Harmless Error

Even if we were to conclude that Souza's statements constitute testimonial hearsay admitted in violation of *Crawford,* we would find the trial court's error to be harmless. Under the *Chapman*[6] test, a *Crawford* error is harmless where the properly admitted evidence against defendant is overwhelming and the improperly admitted evidence is merely cumulative. To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question. (*People v. Song* (2004) 124 Cal.App.4th 973, 984–985.)

Not only did defendant have complete access to Manning's PayPal account, she also had complete access to the inventory of Prints Old and Rare. She was a trusted employee who was allowed in the building at a time of day when no other employees were present. She claimed she was authorized to take many prints home, despite Manning's and Lindner's statements to the contrary. Alonzo also testified that he never helped her load prints into her car. The sheer volume of stolen property found in the Modesto home—valued at $95,**990.50**—belies any innocent purpose of its presence. Further, the money deposited into the Eprintseller's PayPal account was directly linked to defendant's address and credit cards. The evidence of the personalized notes sent to other sellers from that account (e.g., declaring a love for the color pink) supported the inference that she was aware of the activities associated with that account, including the payments made to Eprintseller from Manning's accounts. In sum, irrespective of Souza's statements to the police, any error was harmless beyond a reasonable doubt.

---

[6] *Chapman v. California* (1967) 386 U.S. 18.

## DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

16