# IN THE COURT OF APPEALS OF IOWA

No. 21-1338
Filed February 8, 2023

**STATE OF IOWA,**
 Plaintiff-Appellee,

**vs.**

**DARRIEL MARCELL DEAN,**
 Defendant-Appellant.

_____

Appeal from the Iowa District Court for Henry County, John Wright, Judge.

The defendant appeals from his convictions for child endangerment causing serious injury and child endangerment, challenging the competency of a child witness as well as the weight and the sufficiency of the evidence. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., Greer, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**POTTERFIELD, Senior Judge.**

Darriel Dean appeals his convictions for child endangerment resulting in serious injury and child endangerment. He challenges (1) the district court's decision that five-year-old K.D. was competent to testify, (2) the sufficiency of the evidence to support each of his convictions, (3) and the district court's denial of his motion for new trial based on the weight of the evidence.

**I. Background Facts and Proceedings.**

Dean was charged by trial information with child endangerment causing serious injury and child endangerment. His children, F.D. and K.D., were the alleged victims. The charges were based on the fact that three-year-old F.D. needed to be transported to the hospital due to having what appeared to be a seizure in the early morning hours of April 16, 2021. Further tests showed F.D. had a fracture in his skull in the left frontal lobe. Initial reports noted that Dean reported F.D. was having issues as early as 9:00 or 10:00 p.m. on April 15, but medical help was not sought until 1:33 a.m. on April 16. Additionally, it was alleged that five-year-old K.D. suffered trauma as a result of the harm done to F.D.

Dean pled not guilty and elected to have a jury trial.

At the two-day trial in July, K.D. and seven-year-old G.B., who were both present on April 15, testified about what they witnessed. Additionally, the emergency room (ER) physician who was working when F.D. arrived at the ER, Dr. Rose Schabilion, testified. The officer who investigated F.D.'s injury and the mental health counselor who met with K.D. in November 2021 also testified.

The jury found Dean guilty of both counts as charged. After denying his motion for new trial, the district court sentenced Dean to a term of incarceration not to exceed ten years.

Dean appeals.

## II. Discussion.

### 1. Competency of Child Witness.

Dean challenges the competency of K.D., the five-year-old witness who testified for the State at trial. He maintains the district court abused its discretion in finding her competent to testify. *See State v. Brotherton*, 384 N.W.2d 375, 377–78 (Iowa 1986) (reviewing ruling on witness competency for an abuse of discretion).

Under Iowa Rule of Evidence 5.601, "[e]very person is competent to be a witness unless a statute or rule provides otherwise." Dean urges us to use the test that was laid out in the prior version of the rule and argues the district court abused its discretion by failing to do so.[1] But Dean did not ask the district court to use the old test. *See Top of Iowa Coop v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("[O]ne purpose of our error preservation rules is to ensure that the opposing

---

[1] Under Iowa Rule of Evidence 601 (1985), "a child [was] presumed to be competent." But if the child's competency was questioned, then the court was required to determine:

> (1) the child is mentally capable of understanding the questions being asked;
> (2) the child is able to formulate intelligent answers and communicate impressions and recollections regarding the incident about which the child is to testify; and
> (3) the child can understand the responsibility to tell the truth.

*State v. Andrews*, 447 N.W.2d 118, 120 (Iowa 1989) (citing Iowa R. Evid. 601 (1985)). The text of the rule changed in 1990 and matches what is now rule 5.601. *See* 1990 Iowa Acts ch. 1015, § 1.

party and the district court are alerted to an issue at a time when corrective action can be taken . . . ."). And, even if he had, we conclude that test is no longer necessary. *See State v. Cahill*, 972 N.W.2d 19, 34 (Iowa 2022) ("The basic premise behind Federal Rule 601 and presumably behind the most recent Iowa rule is that virtually all witnesses who possess relevant evidence should be allowed to present it to the jury and allow the jury to determine its probative value." (quoting 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.601:1 (Nov. 2022 update) [hereinafter Doré, *Evidence*]).

Instead, with the starting point that every person is competent to testify absent some other rule or law preventing them, the court should focus on whether other rules of evidence prevent the testimony. *See* Doré, *Evidence* § 5.601:1 ("[M]any trial courts likely will look carefully at the requirements of Rules 5.602, 5.603 and 5.403 when deciding child witness competency."); *see also* Iowa Rs. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."), 5.602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."), 5.603 ("Before testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience.").

Here, the district court engaged in lengthy colloquy with K.D.:

> Q. What is your name? A. [K.D.]
> Q. Hi, [K.D.] How old are you? A. Five.

Q. Five years old. Does that mean that you're in kindergarten? A. Not yet.

Q. Oh, okay. Are you going to go to kindergarten next year? A. Yes.

Q. And, [K.D.], do you have any brothers or sisters? A. I have—Yes.

Q. And how many brothers do you have? A. Uh—

Q. Pardon me? A. I don't remember.

THE FOSTER FATHER: Who's your brother?

K.D.: [F.], [Z.], [T.]—

THE FOSTER FATHER: She's talking about her—our kids, but [F.] is her biological brother.

THE COURT: Okay. Just a second, sir. I need to ask her these questions. So [K.D.], what is your last name? A. It's hard to remember.

Q. Yeah, it is. So let's talk about something that might be easy to answer, okay? Let's talk about when you're telling your friends a story. Can you think of any stories you might have told your friends? A. Well—

Q. Well, do you tell your friends any secrets? A. Uh, no.

Q. Okay. Do you like to play with friends? A. Yes.

Q. And when you play with friends, do you talk about things? A. Yes.

Q. What would you talk about? A. I would talk about that we do something, to play, like Polly.

Q. What is it? A. Polly.

Q. Oh, okay. So I haven't had a [five] year old around for a while, so I'm not up to date on those. Do you like to play games? A. Yes.

Q. And when you play games, do you play by the rules? A. Uh, yes.

Q. Okay. And when you are asked questions by your friends, do you tell them the answers? A. Yeah. It's kind of hard to tell the answers.

Q. Okay. So if I asked you, what is the color of my tie, what would you say? A. Blue.

Q. Okay. And if you were to look at, say, the color of the mask that [the guardian ad litem] is wearing, what color is that? A. Black.

Q. Okay. There's a fire extinguisher right beside you. What color is that? A. Red.

Q. Do you know what it means to tell the truth? A. Yes.

Q. Tell me what it means to tell the truth. A. That you don't lie. You just say the truth when it's hard, but you do it anyway.

Q. And is it good to lie? A. No.

Q. And if someone were to ask you a question, would you tell the truth or would you lie? A. Tell the truth.

Q. So do you know what a promise is? A. Yes.

Q. Tell me what you think a promise is. A. It's when someone says not to break their promise, you don't break their promise. You keep the promise. When someone says not to break the promise, you don't break the promise.

Q. Are you supposed to break a promise? A. No.

Q. And if I have you talk to the lawyers, these two men sitting over here, later this morning, do you think you can do that? A. Yes.

Q. Okay. And if they ask you questions, are you going to lie or are you going to tell the truth? A. Tell the truth.

Q. If you think that what you are saying might hurt a friend, would you still tell the truth or would you lie? A. Still tell the truth.

Q. Okay. Do you have any questions for me? A. I like your clothes.

THE COURT: Thank you. Okay. [K.D.], thank you for coming in. And you can go back to coloring or playing or whatever it was you were doing.

Dean contends K.D. was not competent to testify because she "could not recall her last name or who here brothers were." But as those questions were posed to a young child living in foster care, the answers may be less straightforward than Dean suggests. And, either way, those facts and whether K.D. could testify to them have no bearing on what she witnessed and could recollect about the April 15 incident. The issues Dean raises goes to K.D.'s credibility and the weight to be given her testimony rather than its admissibility *See Cahill*, 972 N.W.2d at 34 (noting the defendant did "not cite a single reported Iowa case holding that inconsistencies in recollection or narrative are, by themselves, a ground for excluding a witness" and his "challenges to the three witnesses [were] classic examples of jury arguments about weight rather than arguments for the court about admissibility"); *see also Brotherton*, 384 N.W.2d at 378 ("Competency of a witness is not disproved by a witness' 'mere testimonial inconsistency;' rather, this is a matter directed to the weight to be afforded the witness' testimony by the jury." (citation omitted)). And it is "not the district court's job to decide on witness

credibility prior to trial." *Cahill*, 972 N.W.2d at 34. Nothing elicited by the court during the colloquy suggests another rule of evidence prevented K.D. from testifying, and Dean has offered no other statute or rule that was violated by allowing K.D. to testify. *See* Iowa R. Evid. 5.601.

The district court did not abuse its discretion in finding K.D. competent to testify.

**2. Sufficiency of the Evidence.**

Dean challenges the sufficiency of the evidence supporting each of his convictions. "We review the sufficiency of the evidence for correction of errors at law." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (citation omitted). In doing so, "we are highly deferential to the jury's verdict." *Id.* "The jury's verdict binds this court if the verdict is supported by substantial evidence," which is "evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted). The State must prove every element beyond a reasonable doubt. *See State v. Williams*, 674 N.W.2d 69, 71 (Iowa 2004).

**A. Child Endangerment Resulting in Serious Injury.**

For the jury to properly convict Dean of child endangerment resulting in serious injury, the State had to prove:

> 1. On or about April 15, 2020 through April 16, 2020, [Dean] was the parent of F.D.
> 2. F.D. was under the age of fourteen years.

3. [Dean] acted with knowledge that he was creating a substantial risk to F.D.'s physical health or safety.

4. [Dean's] act resulted in serious injury to F.D.

Dean challenges the evidence to support both the third and fourth element. First, Dean argues there is insufficient evidence that his actions led to any injury of F.D.; he suggests, as he did at trial, that the jury could not rule out the fact that F.D. may have fallen or been accidentally injured while playing. And second, he challenges that the State proved F.D. suffered a "serious injury." We start with his first argument.

On appeal, Dean focuses on the facts that the treating ER doctor could not rule out the possibility the F.D.'s injury was caused by his hitting his head on a "coffee table or fireplace or something like that" and that he told a police officer who was investigating F.D.'s injuries that he does not hit his children. But these handpicked facts play no role in our review of the sufficiency of the evidence. *See State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005) ("It is not the province of the court, in determining [whether sufficient evidence exists] to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." (citation omitted)); *see also State v. Lacey*, 968 N.W.2d 792, 800–01 (Iowa 2021) ("Evidence is not insubstantial merely because we may draw different conclusions from it; the ultimate question is whether it supports the finding actually made, not whether the evidence would support a different finding." (citation omitted)).

Viewing the evidence in the light most favorable to the State—as case law requires—we easily conclude the jury could find that Dean hit F.D., causing his

injury.[2]  Both five-year-old K.D. and seven-year-old G.B. were present at the time of F.D.'s injury.  Both girls testified they were playing when F.D. spilled his juice on the floor.  K.D. did not see what happened next because she "closed [her] eyes a little bit because [she] didn't want to see what happened next because [she] thought something bad would happen."  While G.B. testified that after F.D. spilled, "[Dean] just came in and got mad."  She saw Dean go "over and hit [F.D.] three times."  After that, F.D. "just stopped talking"; he "was just on the couch" with his eyes closed.  Substantial evidence supports the jury's conclusion it was an act by Dean that caused F.D.'s injury.

Second, we consider whether the State proved F.D. suffered a serious injury, which a jury instruction defined as "a bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or extended loss or impairment of the function of any bodily part or organ."  Dean

---

[2] Despite both Dean and the State discussing it in their respective appellate briefs, we do not consider whether there was substantial evidence to support a finding of guilt based on Dean's failure to get medical treatment for F.D.  *See* Iowa Code § 726.6(1)(d) (defining child endangerment as "[w]illfully depriv[ing] a child . . . of necessary . . . health care . . . , when the person is reasonably able to make the necessary provisions and which deprivation substantially harms the child or minor's physical, mental or emotional health").  While that is an alternative for convicting a person of child endangerment, the jury was never instructed on it.  *See State v. Banes*, 910 N.W.2d 634, 639 (Iowa Ct. App. 2018) ("Where, as here, the jury was instructed without objection, the jury instruction becomes law of the case for the purposes of reviewing the sufficiency of the evidence."); *cf. State v. Leckington*, 713 N.W.2d 208, 213 (Iowa 2006) (finding sufficient evidence supported the convicted where the jury had to find "[the defendant] knowingly acted in a manner creating a substantial risk to [the minor's] physical, mental, or emotional health or safety, *or [the defendant] willfully deprived [the minor]of necessary health care or supervision appropriate to [his] age when she was reasonably able to make the necessary provisions* and which deprivation substantially harmed [the minor's] physical, mental, or emotional health" (emphasis added)).

argues that while the treating ER physician testified F.D.'s "vitals were low, there was no indication . . .that there was substantial risk of death." We disagree.

"[A] substantial risk of death means more than just any risk of death but does not mean that death was likely. If there is a 'real hazard or danger of death,' serious injury is established." *State v. Anderson*, 308 N.W.2d 42, 47 (Iowa 1981). And here, the ER doctor described F.D. as "nearly comatose" when he got to the hospital. The doctor intubated F.D. and placed him on a ventilator because, according to the doctor's testimony, his reduced state made it uncertain whether he would continue to breath on his own. It was also unclear F.D. would be able to protect his airway from his own saliva and stomach contents, placing him "at high risk of sort of sucking those things into [his] lungs, aspirating." F.D. was then sent by helicopter to University of Iowa Stead Family Children's Hospital because he needed an intensive care unit level of care. The doctor's testimony F.D. might not be able to continue breathing constitutes substantial evidence he was in real danger of death.

Substantial evidence supports Dean's conviction for child endangerment causing serious injury.

**B. Child Endangerment.**

For the jury to properly convict Dean of child endangerment resulting in serious injury, the State had to prove:

> 1. On or about April 15, 2020 through April 16, 2020, [Dean] was the parent of K.D.
> 2. K.D. was under the age of fourteen years.
> 3. [Dean] acted with knowledge that he was creating a substantial risk to K.D.'s physical health or safety.

The theory for Dean's child-endangerment charge was that K.D.'s mental and emotional health was harmed by witnessing Dean injure F.D. As he did for his other conviction, Dean claims the State failed to prove he did any act to F.D. And for the same reasons as we previously stated, we disagree. The testimony of G.B. and K.D. is substantial evidence that Dean hit F.D.

Alternatively, Dean contends the State failed to establish a link between his action and the trauma response the licensed mental health counselor testified she witnessed in K.D. in November—more than six months after F.D.'s injury. Dean claims "any number of things could have occurred causing a trauma response in K.D." But the counselor testified specifically that K.D. "demonstrated a number of trauma responses related to this case. She avoided certain things. She got very restless and needed to check on people and make sure other people were safe and continued to demonstrate that anxiety trauma response throughout my time with her." And after that testimony, the prosecutor reconfirmed that the counselor was testifying the trauma response was related to the injury of F.D.—this exchange took place:

> Q. So to be clear, you did discuss an incident that happened on April 15th or 16th of 2020? A. Correct.
> Q. And [K.D.] expressed a trauma response to that incident? A. That is correct.
> . . . .
> Q. What sort of conclusions did you make from your assessment? A. In terms of the trauma response, I concluded that she evidenced a number of criteria that fit the category of a trauma response that she was experiencing that seemed to have been triggered by many events that occurred on April 16th—or about April 16, 2020. She evidenced a number of problematic symptoms in my presence, including restlessness, avoidance of certain topics, avoidance of certain emotional responses, wanting to change topic when she became upset about certain things, wanting to leave the room and check on the individuals that had brought her, a number of

issues related to her functioning that she discussed in terms of behavioral problems that she was having both in the community, home, and school. All of that continued to meet the symptoms related to a significant trauma response that was impacting her functioning day to day, including while she was sitting with me.

. . . .

Q. . . . Based on the incident that occurred April 16th of 2020, did it affect [K.D.'s] mental or emotional health? A. Yes.

Q. To what degree of certainty are you regarding that conclusion? A. Based upon all my education, training, and continuing education, it is my opinion that she was demonstrating a trauma response within my professional psychological certainty.

A rational trier of fact could be convinced by the counselor's testimony that the mental and emotional harm K.D. was exhibiting was linked to the injury of F.D., so this conviction is supported by substantial evidence. *See Crawford*, 972 N.W.2d at 202 ("Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.").

**3. Motion for New Trial.**

Dean moved for new trial, claiming the verdict was contrary to the greater weight of the credible evidence. *See* Iowa R. Crim. P. 2.24(2)(b)(6). At the hearing on the motion, Dean asserted "one the witnesses testified to the fact that she did not see how the injury occurred" and "[t]he second witness was problematic in that she agreed that she had previously stated that she had not [seen what occurred], regardless of what she testified to in trial." The court denied Dean's motion and, ruling orally from the bench, stated:

Well, the Court would note that this case presented facts that are not unusual in that there aren't a lot of witnesses, and the State brought forth two children as witnesses in this case.

The Court would point out to support [Dean's] motion, one of the victims, the victim under Count II, [K.D.], testified that she did not see [Dean] hit her brother [F.D.]

On the other hand, [G.B.], who is 7 years old, was called to the stand and she said that she saw [Dean] hit [F.D.] three times, and

this was as a result of [F.D.] spilling his juice. She then saw or observed that [F.D.]was not able to get up, and he was on the couch with his eyes closed.

On cross-examination by the defense counsel, she testified that she saw what happened, but she had told the Department of Human Services and a police officer a different story when they first interviewed her. She reiterated on redirect that she did see [Dean] hit the child three times.

. . . I pointed out at the beginning of this that this is not unusual that there are only a few witnesses to a crime. Sometimes there's only one witness. But the testimony that was brought forth at the time of trial was testimony that convinces me that any motion for new trial should be overruled.

I recognize, Mr. Dean, that the evidence does not seem to be overwhelming or coming from people who would be of majority age. But the State brings forth those witnesses it believes have personal information, and I'm satisfied that the evidence is such that a new trial is not warranted.

We review the court's ruling for an abuse of discretion. *State v. Linderman*, 958 N.W.2d 211, 218 (Iowa Ct. App. 2021). Our "review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *Id.* (citation omitted). "Abuse of discretion occurs if the district court 'exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* (citation omitted).

On appeal, Dean argues the district court wrongly denied his motion for new trial because it failed to take into account what occurred during G.B.'s testimony. After testifying that she saw Dean hit F.D. three times, outside the presence of the jury G.B. was shown a portion of a video from when she spoke with a social worker and police officer shortly after the incident.[3] The video reminded G.B. that when

---

[3] F.D. was taken to the hospital around 2:00 a.m. on April 16. It is not clear from the record whether G.B. talked to the social worker and officer later the same day or on April 17.

asked if she saw what happened to F.D., she initially reported she "didn't see it."

As Dean's attorney attempted to pin down whether someone told G.B. that Dean

hit F.D., the court interrupted and the following took place:

> THE COURT: Just a minute.  Come forward, ma'am.
> (The mother of the witness approached the bench.)
> THE COURT: You're going to wait outside.
> MOTHER OF WITNESS: That's my child.
> THE COURT: Stop.  You will not try to lead this witness into—
> MOTHER OF WITNESS: I'm not leading her into nothing because I told her what she knows.
> THE COURT: Take her outside.
> MOTHER OF WITNESS: And my daughter can come with me.
> THE COURT: Now.
> MOTHER OF WITNESS: She shouldn't even be a part of this.
> (The mother of the witness was escorted from the courtroom.)
> THE COURT: Proceed, [defense counsel].

Due to the mother's apparent interference and G.B.'s inconsistent answers

regarding whether she witnessed Dean hit F.D., Dean asserts G.B. "lacks any

credibility."  According to Dean, this combined with K.D. testifying she did not see

Dean hit F.D. means the greater weight of the evidence supports acquittal.

In its evaluation of Dean's motion, the district court recognized that G.B.

was inconsistent in that she told the social worker she did not see Dean hit F.D.

but then repeatedly testified she witnessed him hit F.D. three times.  It seems the

district court found G.B.'s trial testimony credible in spite of the inconsistency and

her mother's apparent interference.[4]  And the district court is in a better position to

---

[4] During her testimony, G.B. seemed to be trying to explain that she saw Dean hit F.D. out of the corner of her eye or in her periphery vision rather than straight on. On cross-examination, she testified:
> Q. And do you agree with me that at least at that point in time, you told someone that you didn't actually see what happened to [F.D.]?
> A. I mean, sometimes my eye goes, like, away and I can see still.
>      . . . .

evaluate witness credibility. *See Johnson v. Kaster*, 637 N.W.2d 174, 178 (Iowa 2001) ("[W]e are especially deferential to the district court's assessment of witness credibility." (alteration in original) (citation omitted)).

Additionally, in arguing whether a credible witness testified as to actually seeing Dean hit F.D., Dean ignores all of the circumstantial evidence that supports a finding he caused the injury. *See* Iowa R. App. P. 6.904(3)(p) ("Direct and circumstantial evidence are equally probative."). While K.D. did not report seeing a hit, she testified that she shut her eyes after F.D. spilled his juice because she sensed that "something bad would happen." Similarly, whether she actually saw Dean hit F.D., G.B testified that Dean was angry at F.D. for spilling his juice and, after that, F.D. stopped talking and laid on the couch unmoving. According to the ER doctor, when Dean came in with F.D., Dean repeatedly refused to answer questions about what happened to F.D.; he offered no explanation of what occurred. But the statements he did give corroborate the testimony of K.D. and G.B.; he told Dr. Schabilion that around 10:00 p.m., he "found [F.D.] lying on the couch making a—he used the word 'weird cry' and [F.D.] was not responding to [him]." Additionally, Dean told the doctor he thought F.D. might have a headache so he put a cold wash cloth on his head. But when she asked a follow up about

---

Q. Do you agree that you said that you don't know because you weren't looking? A. I mean, because my eye, like, moved this way, so I can still see.

Q. Do you agree with me that you told the lady that someone else said— A. Okay, well, yeah.

Q. Right? A. Yes.

Q. So you heard someone else say that Mr. Dean hit [F.D.]; correct? A. Yes.

Q. You didn't see it yourself? A. I mean, I could still see with my eyes so basically—

why he would believe F.D. had a headache since "[i]t's not the most common complaint in children," Dean again reverted to silence. By his own reported action, it seems Dean was aware that F.D. had suffered a head injury by about 10:00 p.m—a fact he was unlikely to know if he did not cause it since bruising was just starting to form when F.D. arrived at the hospital around 2:00 a.m. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("Admissions may be implied by the conduct of the defendant subsequent to a crime . . . .").

The district court did not abuse its discretion in denying Dean's motion for new trial. *See State v. Benson*, 919 N.W.2d 237, 243 (Iowa 2018) ("[A] district court should only grant a motion for new trial 'in the extraordinary case in which the evidence preponderates heavily against the verdict rendered.'" (alteration in original) (citation omitted)).

## III. Conclusion.

The district court did not abuse its discretion in finding a five-year-old witness competent to testify or in denying Dean's motion for new trial. And substantial evidence supports both of Dean's convictions. So, we affirm.

**AFFIRMED.**